## CORUM v. UNITED STATES.
### No. 46525.

United States Court of Claims.
Jan. 3, 1949.

Charles I. Dawson, of Louisville, Ky., for plaintiff.

John R. Franklin, of Washington, D. C., and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

MADDEN, Judge.

Four companies made a contract, dated January 10, 1941, to construct for the Government, on a cost-plus-fixed-fee basis, near Charlestown, Indiana, and some ten miles from Louisville, Kentucky, a plant for the loading of propellant charges. These four companies will be referred to hereinafter as the prime contractors, and their contract with the Government as the prime contract. The contract obligated the Government to reimburse the prime contractors for their expenditures in the performance of the contract, including the rentals which they might pay to third persons for the use of machines and equipment hired from those third persons. The contract provided that any lease of equipment from third persons should be written in a form prescribed by the Secretary of War, should be subject to approval by the

Government's contracting officer, and should contain the same provisions entitling the Government to acquire title to such equipment by the application of rentals paid toward the purchase of the equipment as the provisions contained in paragraph 2 of Article II of the prime contract. The reference was to a provision quoted in full in our Finding 2, which said that when the prime contractors brought machines or equipment on the job there should be an agreement with the contracting officer as to their value, and as to the rent which the Government would pay the prime contractors for their use, and that when the rents paid equaled the agreed value plus 1% of that value for each month that the equipment had been used on the job, the equipment should become the property of the Government. It further said that upon the termination of the use of any equipment on the job the Government could at its option acquire title to it by paying the prime contractors the difference between the amount of the rentals already paid, and the agreed valuation plus 1% of that valuation for each month that the equipment had been used on the job. This process of taking the property and applying the rents as full or partial payment will be referred to hereinafter as recapture.

The prime contractors desired to rent a large number of machines, and asked several persons and companies, known to have such machines, to give them proposals for leasing them. The plaintiff told the prime contractors that he and several other persons or enterprises within his acquaintance each had some of the desired machines. He was told by the prime contractors that they did not want to make several separate leases, and that he should obtain authority to make a proposal and a contract for his group. He obtained that authority and made a proposal in writing which contained no recapture clause. He was told by the prime contractors that it should contain a recapture clause, crediting all of the rentals paid on the recapture price of the equipment. The plaintiff said, for himself and his associates, that they would not lease their machines on that basis since they had no desire to sell them. The plain-

tiff then offered to allow 10% of rentals paid to be credited on a recapture of the machines. This offer was rejected. He then offered to credit 20% of rentals paid toward recapture, and this offer was accepted by the prime contractors. This suit arises out of that departure from the provisions of paragraph 2 of Article II of the prime contract.

Lieutenant Colonel Rosswell E. Hardy was the Government's contracting officer at the Hoosier plant. To make the rentals paid by the prime contractors to third persons reimbursable to them by the Government, the prime contract provided that leases of equipment had to be approved by the contracting officer. It also provided, as we have seen, that such leases had to be on the form provided by the Secretary of War. Two of the contracting officer's subordinates had already canvassed the proposals received by the prime contractors and had recommended the acceptance of the plaintiff's proposal as to a considerable number of machines, and of the proposal of another offeror as to the rest of the machines needed. The plaintiff's lease was written on the stereotyped form provided by the Secretary of War, but some ten changes were made which departed from the letter of that form. Article XI of the form provided a space for the insertion of agreed changes, and the ten changes were noted in that space, as well as being made at their pertinent place in the body of the form. The change which concerns us was the one made in Article VII of the form, which change provided that only 20% of the rent paid by the prime contractors should be credited toward the recapture price of the equipment. The contracting officer was aware of this change when he wrote his name on the rental contract, at the place provided for the contracting officer to indicate his approval. Before he approved it he submitted it to the Zone Constructing Quartermaster at Columbus, Ohio, as one of his instructions from the War Department seemed to require. However, that officer returned the contract to him saying that approval of the rental agreement was a function of the contracting officer. The contracting officer thereupon approved it. The lease was dated February 18, 1941, and the War Department's stereotyped form was No. 40/2111.

■ The plaintiff's equipment was placed on the job and used, and the prime contractors paid the plaintiff the agreed rent. The construction project was accelerated and enlarged, and more equipment was needed. The plaintiff was asked, from time to time, to submit proposals for the additional equipment, and when one of his proposals was accepted, a new lease was not written out on the form prescribed by the Secretary of War, but an order was written by the prime contractors which called itself "an addition to and part of Rental Agreement Form No. 40/2111 dated February 18, 1941." This order, with the plaintiff's proposal attached, was signed by the prime contractors and by the plaintiff, and was approved in writing by Major W. O. Hauck who signed his approval as Constructing Quartermaster. Major Hauck was not the Constructing Quartermaster, but he acted for Lieutenant Colonel Hardy in most of the transactions between the plaintiff and the prime contractors. There is no evidence that he did not sign these approvals as the representative of the contracting officer. They were written and treated by the plaintiff, the prime contractors and the Government as amendments to the plaintiff's original lease of February 18, 1941, and we think they were as valid as if each one of them had been newly written on the stereotyped War Department form. There were several of these amendments, and some six of them relate to matters that are in issue in this case.

When the prime contractors' need for the use of any of the plaintiff's machines had expired, they would notify the contracting officer that they were about to release the machine to the plaintiff, unless the contracting officer desired to exercise the Government's option to recapture the machine. Some of the machines were released to the plaintiff, but, as to most of them the option to recapture was exercised and the plaintiff was instructed to prepare an invoice and a bill of sale to the Government for the machine. The Government immediately took possession of the

machine, and the plaintiff prepared the invoice and bill of sale which showed the valuation, the rent received, the balance left by subtracting 20% of the valuation from the rent, and the sum obtained by adding to this balance 1% of the valuation for each month of use. The Government's representatives checked these papers and then delivered to the plaintiff a document entitled "Purchase Order-War Department," which paper set out the same computation which the plaintiff had submitted, and said that the machinery was purchased in accordance with the authority and procedure contained in Article VII of the plaintiff's lease agreement. These purchase orders were issued by the Office of the Zone Constructing Quartermaster and were signed for that officer.

The Government paid the plaintiff the amounts stated to be owing on some of these purchase orders, apparently the early ones of the series. But as to such purchase orders covering sixty-three pieces of machinery, the Government refused to pay the amounts due. The balance unpaid, computed according to the provisions of the plaintiff's lease to the prime contractors and the several amendments thereto, is $248,848.26, for which amount the plaintiff sues.

 The Government says that the plaintiff had no contract with the Government and therefore cannot sue, under our jurisdictional act. 28 U.S.C.A. § 1491. The plaintiff's rental agreement was, primarily, between the plaintiff and the prime contractors, and the Government was not responsible to the plaintiff for the agreed rent. Alabama v. King and Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3. But the recapture provision, inserted in the rental agreement at the instance of the Government, whereby, at its option, it could take credit for the rents which it, through the prime contractors, had paid the plaintiff, if it chose to acquire the ownership of the plaintiff's machines, was an agreement expressly for the sole benefit of the Government The only basis on which it could exercise its option was by accepting the obligation to pay for the machines on the terms stipulated in the option. It exercised its option, took the machines express-

ly pursuant to the option, and by its purchase orders promised to pay the amount computed according to the plaintiff's contract. It still has the machines, and has outstanding its express promise to pay for them. There is no lack of contractual relation between the plaintiff and the Government, and we have jurisdiction.

 The Government says that the plaintiff owned only a few of the machines in question and cannot assert the claims of his associates who owned the other machines. We think that the authority given the plaintiff by his associates, upon the insistence of the prime contractors that they wanted to deal with him alone, made the plaintiff a trustee for them of the rights created in them by the contract, just as he clearly became legally obligated to perform the duties owing by their side of the contract. There is no question of any assignment by them to him of a claim against the Government. Their authorization to him was made even before there was a contract, and long before the instant claim against the Government was in existence. Even as an agent, rather than a trustee, the plaintiff could maintain this suit. Section 364 of the Restatement of the Law of Agency states the American rule as follows:

"A person with whom an agent makes a contract on behalf of a principal is subject to liability in an action brought thereon by the agent in his own name on behalf of the principal if the agent is a party promisee."

See also Rule 17(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. We conclude, therefore, that the plaintiff may enforce the rights created by his lease agreement and the acts of the Government in relation to it.

The most serious contention of the Government is that the equipment lease made by the plaintiff and containing the recapture provision upon which the plaintiff bases its claim was invalid because it was beyond the power of the Government agents who purported to approve it and act pursuant to it.

The prime contractors had the power, under the prime contract, to lease equip-

ment from third persons. Paragraph 1 (c) of Article II of the prime contract, quoted in Finding 2, provided that such leases had to be on a form provided by the Secretary of War, and had to be approved by the contracting officer. The plaintiff's original lease was upon the prescribed form and was approved by Lieutenant Colonel Hardy. The Government seems to urge that he was not the contracting officer, but only the representative of that officer. This contention is plainly wrong. Section 3 of Article XIX of the prime contract, quoted in our Finding 4, said that, for all purposes other than the original signing of the contract, the term "Contracting Officer" should be deemed to refer to one individual who should represent both the Quartermaster General and the Chief of Ordnance. Lieutenant Colonel Hardy was that individual. He was the Constructing Quartermaster and also the Commanding Officer at the Hoosier Ordnance Plant. He fits the description, and no one else does. He acted as contracting officer and he was contracting officer. The same provision of the prime contract said that the term contracting officer should include the "authorized representative" of the contracting officer. This provision is of relevance in another connection considered hereinafter.

We have, then, an equipment lease by the plaintiff to the prime contractors, written on the prescribed form, and approved by the prescribed government official. But, the Government says the provision of the lease which credited only 20% of the rents paid toward the recapture price of the property was in violation of the prime contract, and of the War Department's instructions to its agents. The prime contract did provide, in paragraphs 1(c) and 2, Article II, quoted in our Finding 2, that any equipment lease taken by the prime contractors had to provide that the Government should have the right to recapture, and to apply all the rent paid against the recapture price. Various communications from the Office of the Quartermaster General in Washington distributed to Constructing Quartermasters including the contracting officer on this project, showed that it was expected that equipment leases, to receive the approval of contracting officers, should contain the recapture provision quoted above.

■ The plaintiff was not a party to the prime contract, and was not contractually bound by any of its provisions. He was made aware of its provisions in regard to recapture, and of the instructions which the contracting officer had received. He expressly refused to lease his equipment on the basis of such a recapture provision, and made a counterproposal including a provision which would credit only 20% of the rentals paid toward the recapture price. The contracting officer was of the opinion that he was authorized to approve such a lease. Construction Division Letter No. 154 quoted in Finding 5, which had been issued by the Quartermaster General to Constructing Quartermasters, said:

"1.° The Zone Constructing Quartermaster will supervise and assist the constructing quartermasters in all matters pertaining to rental of equipment, from third party lessors. This assistance shall include the review of all equipment rental agreements prior to approval by the Constructing Quartermaster."

The contracting officer sent the plaintiff's proposed equipment lease to the Zone Constructing Quartermaster for such review and assistance, and that officer's reply is shown in Finding 16. That reviewing official was not of the opinion that a lease containing such a modification of the stereotyped recapture provision could not be approved by the contracting officer, for he concluded his advice by saying that approval of equipment leases was a function of the contracting officer, and not of the Zone Constructing Quartermaster. He thus implied that if Lieutenant Colonel Hardy, at the site of the project, saw fit to approve the lease as written, it was proper for him to do so.

■ The stereotyped equipment lease form supplied by the War Department contained as we have said, an Article XI which provided a space for noting changes from the provisions in the form which might be agreed on. Thus the letter of the form contemplated that there should be negotiation and modification of the standard

form. Ten such changes were made in the plaintiff's lease, and were noted in its Article XI. The Government says the one relating to the percentage of rentals to be credited on recapture was beyond the power of its contracting officer to approve. It says that he could approve minor changes but not vital ones. We think this would be a wholly impractical definition of his powers. Whatever may have been the inward intention of the people in the War Department who drafted the form and the instructions, we think that what these papers meant to the ordinary reader who, as an officer or as a contractor had to act upon them, was that the contracting officer so long as he acted in good faith and in what he regarded as the interest of the Government, could negotiate equipment leases and approve their terms as agreed on. The contracting officer thought it meant this, the Zone Constructing Quartermaster thought so, the form itself by its inclusion of Article XI seemed to say so. The prime contractors must have thought so for they were going to pay out large sums of money as rentals on the lease, the reimbursement of which to them would have been jeopardized if the contracting officer's approval had not been valid. The plaintiff, who had expressly refused to lease his equipment except on the basis of the form as modified, also thought the contracting officer had the power to approve this change, or he would not have put his equipment on the job. We cannot conclude that every one who gave thought to the question and acted upon it was wrong, when even now no other satisfactory or practically workable interpretation of the documents in question is suggested to us. We think the plaintiff's equipment lease was valid and is enforceable against the Government.

If we were in doubt as to the initial validity of the lease, we think there is much to show that the Government, with full knowledge of the lease and the actions which had been taken under it, and with full awareness of the question of its validity, has recognized its validity. If the lease was invalid, its making was a violation by the prime contractors of their contract with the Government. Their payment of rentals to the plaintiff after the rentals paid equaled the value of the machines plus one percent of that valuation for each month of use, was an unauthorized expenditure not reimbursable to them by the Government. Yet the Government, after the question of the validity of the lease had been raised, and while it was withholding from the plaintiff the recapture payments provided by the plaintiff's lease, first withheld from the prime contractors money due them and then, apparently after deliberation reimbursed them in full for the rentals they had paid. If the plaintiff's lease was valid as to the prime contractors, it was, we think, valid as to the plaintiff.

As appears in finding 20, only about one-half of the machinery whose recapture is here in question was covered by the plaintiff's original equipment lease dated February 18, 1941. The other machines were supplied by the plaintiff later and covered by documents called additions to and parts of the original lease. They were signed by the plaintiff and the prime contractors and were approved in writing by Major Hauck who signed his approval as "Constructing Quartermaster." We have pointed out earlier in this opinion that the prime contract, in section 3 of Article XIX said that the term "Contracting Officer" should include the contracting officer's authorized representative. Major Hauck had represented the contracting officer at all stages of these equipment lease transactions, and if he was not, as he purported to be, the contracting officer's authorized representative to approve these additions to the plaintiff's lease, we think it was the Government's burden to show that he was not. The contracting officer was a witness in this case, and the Government should have asked him about Major Hauck's authority, if it doubted it. Major Hauck was not called as a witness. He was the Government's man when the transactions here in question occurred, and if the Government thought that he had acted as an impostor in dealing with outside persons, it should have undertaken to prove it. We think that the amendments to the plaintiff's original equipment lease were valid. What we have said above

about the Government's subsequent ratification of the lease is also applicable to them.

Since the Government's counterclaim is founded upon the asserted invalidity of the plaintiff's lease and the amendments thereto, and since we have held these agreements to be valid, the Government's counterclaim will be dismissed.

The plaintiff is entitled to recover $248,848.26. It is so ordered.

HOWELL, WHITAKER, and LITTLETON, Judges, and JONES, Chief Judge, concur.