**NUSS et al. v. UNITED STATES.**
**No. 49586.**

United States Court of Claims.
Jan. 5, 1954.

William F. Welch, Indianapolis, Ind., for plaintiffs. Frank M. McHale, Indianapolis, Ind., was on the briefs.

Bernard Wohlfert, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

JONES, Chief Judge.

The plaintiffs Nuss, Turkle and Church, a partnership doing business under the trade name Alliance Seamless Casket Co., seek compensation for alleged breach of a contract implied in fact. They claim to have presented the plans, specifications and idea in connection with a casket used by the defendant to return to the United States the bodies of military personnel buried overseas.

In 1944 the Office of the Quartermaster General of the Army Service Forces, anticipating the authorization by Congress of a program for the return from overseas cemeteries deceased military personnel of World War II, directed its Memorial Division to make a study of the problems and requirements involved in such a program. At that time the Memorial Division had the duty of administering military cemeteries, the maintenance of grave registration records, including maintaining records of deceased soldiers, notifying their next of kin, and in general supervising overseas burials and grave registrations.

The Memorial Division which was under the direction of Colonel Harbold, requested the Casket Manufacturers Association of America to assist in the study and formulation of a program for the production of a suitable casket. In November 1944 the Association notified its members of the request and in early 1945 set up a technical committee headed by a Mr. Strunk, who was the production manager of the Boyertown Casket Company, to prepare specifications for a suitable casket, and to assist generally in the development of a repatriation program.

Since the Association was limited to companies and firms, the plaintiffs were not members.

This Association offered its services to the Memorial Division without any understanding or expectation that royalties or fees would be charged for the use of any plans, specifications, ideas or services furnished or submitted by it or any of its members.

The plaintiff Nuss had been the Cleveland branch manager of the Boyertown Casket Company of Boyertown, Pennsylvania, since 1935, and for five years prior thereto he was employed as a designer of caskets at the Columbus branch of that company.

In 1933 he learned of the effort of a competitor of his employer to manufacture a seamless casket by the deposit of copper on a plastic form. He studied the idea of manufacturing a metal casket by pressing the main body from a single sheet of steel so as to eliminate the welded seams generally found in metal caskets manufactured by the industry. The idea involved a top stamped from a single sheet, a receptacle drawn from a single sheet of steel, and a separate cradle to support the receptacle or container.

From 1935 to 1944 the plaintiff Church also was employed by the Cleveland branch of the Boyertown Casket Company. In 1944 Mr. Church left this position and purchased and thereafter operated a concrete-burial-vault manufacturing company. Mr. Nuss first discussed his seamless casket idea with Mr. Church in 1935.

The first public disclosure by Mr. Nuss of his idea was in 1939 when he held a conference with representatives of the Republic Steel Corporation concerning the use of stainless steel in the manufacture of a seamless casket. He also about that time discussed his idea with the plaintiff Turkle, who operated a mortuary business at Alliance, Ohio.

In the spring of 1944 Mr. Turkle who at that time was president of the National Selected Morticians Association, arranged for Mr. Nuss to present his ideas to a research committee of that organization at Pittsburgh, Pennsylvania. The Association at that time was investigating casket material and designs for use in the repatriation program, such investigation being at the request of Colonel Harbold, the director of the Memorial Division of the Quartermaster Corps. Several members of the committee were present, as were also

representatives of the Republic Steel Corporation and the Carnegie-Illinois Steel Corporation. The question was discussed as to whether a deep-drawn steel casket could be made and it was suggested that if anyone could do it it would be C. J. Rodman of Alliance-Ware, Inc., of Alliance, Ohio, whose company was engaged in the manufacture of deep-drawn bath tubs.

After conferences were held between the plaintiffs and Mr. Rodman, Mr. Rodman at Mr. Turkle's invitation addressed the fall meeting of the National Selected Morticians Association on the subject of porcelain enameling a deep-drawn casket.

In the spring of 1945 plaintiff Turkle retired as president of the National Selected Morticians Association, but while in that office he had experienced contacts with the Memorial Division of the Quartermaster Corps and other agencies of the defendant.

In April 1945 Mr. Turkle and Mr. Nuss discussed the idea of bringing the suggested seamless steel casket to the attention of the Quartermaster Corps. Soon thereafter the plaintiffs were associated in partnership.

About April 7, 1945, Mr. Turkle went to the office of Major Beyers in the Memorial Division of the Quartermaster Corps and in behalf of the Alliance Seamless Casket Company presented a brochure containing drawings of a deep-drawn seamless casket proposed for use in the repatriation program. Major Beyers at that time was assigned under the direction of Colonel Harbold to study and assemble data concerning a proposed program and to investigate the general problem of plans and specifications for caskets and shipping boxes in order to have a design which would meet the approval of the Research and Development Branch of the Military Planning Division of the Quartermaster Corps.

Major Beyers took Mr. Turkle to see Colonel Harbold who briefly examined the brochure and commented that he was not setting anybody up in the casket-manufacturing business, to which Mr. Turkle replied that he was already in that business. Then Colonel Harbold concluded the conference by stating that the problem was assigned to Major Beyers and he could go ahead and review the matter. After leaving Colonel Harbold, Major Beyers conferred further with Mr. Turkle and requested more specific details.

On July 13, 1945, a conference called by Colonel Harbold was held in Washington, D. C., between the committee of the casket manufacturers' association and the Memorial Division of the Quartermaster Corps. The announced objective was to inspect five full-sized sample caskets submitted by various manufacturers.

There followed a rather full discussion of the subject. Major Beyers had invited the plaintiffs to attend and they were present. Mr. Rodman of Alliance-Ware, Inc., was also present.

The question of whether a seamless casket was practical was discussed, and Mr. Rodman explained in detail his plant and equipment and expressed the conviction that such a deep-drawn casket could be manufactured.

After considering the various full-sized caskets the general understanding was that the committee of the casket manufacturers' association would proceed to prepare its recommendations for the Memorial Division and as to what tests should be made in the research and development line.

The Research and Development Branch which had the duty of developing, designing, and specifying items of military supplies under the Quartermaster General delegated Lt. Paden to represent the branch at the July meeting and soon thereafter an order was issued to the Research and Development Branch to undertake the development of a suitable military casket for the purpose indicated.

In September 1945 the plaintiffs submitted to Major Beyers an additional brochure. Lt. Paden had observed that

in the proposed model the flange on the top section of the casket turned outward, while that on the body section turned inward, and that this afforded a point for leakage where the bolts were fastened. It was then decided to have the flange on the body section turn outward instead of inward.

On October 3 and 4, 1945, a conference was held in Washington, D. C., between the technical committee of the casket manufacturers' association and representatives of the Memorial Division and the Research and Development Branch. The technical committee made its recommendation with respect to the conventional seamed casket best suited for the repatriation program. The plaintiff Turkle was · present and discussed and promoted the idea of a seamless casket.

Up to that time the plaintiffs had had no personal contacts with any agent of the defendant outside the Memorial Division. At that time Major Beyers advised Mr. Turkle that the Research and Development Branch would prepare specifications subject to his approval.

The Research and Development Branch in October 1945 submitted a report of its findings and recommendations which included a rejection of the conventional type casket and recommended the adoption of either a seamless liner to be inserted in a conventional casket or a seamless casket drawn from steel with base, trim and handles applied by spot welding. The seamless liner types had been suggested by the Modern Casket Company of Chicago. The second type was used in the repatriation program.

After a further conference with the technical committee of the casket manufacturers' association and Lt. Paden and a representative of the Research and Development Branch at which Major Beyers and plaintiff Turkle were present, Major Beyers announced that the research and development representatives would go to the plant of Alliance-Ware, Inc., at Alliance, Ohio, to watch the operation of the Bliss press used in the deep-drawing of steel bath tubs, and also inspect the plant in an effort to determine the feasibility of manufacturing a seamless casket.

On November 8, 1945, Lt. Paden and Mr. Wallance, who represented the Research and Development Branch, visited the Alliance-Ware plant and discussed technical problems with engineers and officials of that company. Also present were representatives of the Republic Steel Corporation and various representatives of casket manufacturing companies, and Major Beyers and plaintiff Turkle. Following this visit Lt. Paden and Mr. Wallance reported to the Quartermaster General in part as follows:

"The fabrication of a seamless casket is both feasible and practical. The Alliance Ware Company is equipped and in a position to fabricate the deep drawn shells for the body of such a casket. The casket manufacturing industry, as represented by those present at the above described meeting, will cooperate in development and production of the seamless casket."

Lt. Paden, who was assigned by the Research and Development Branch the responsibility of preparing the specifications for the repatriation casket, was an experienced furniture designer but not an engineer. He attended a number of meetings at which he came in contact with one or more of the plaintiffs. He knew as early as July 1945 that the plaintiffs had submitted the seamless casket idea to the Quartermaster Corps. He sought information and help from the Casket Manufacturers Association, but his main contacts were with the Galanot Products Company. The Galanot Products Company expressly disclaimed to Lt. Paden any interest in entering into a research and development contract with the defendant, but indicated it would rather develop the casket and pay its own costs of development.

The written specifications dated January 7, 1946, upon which bids were ultimately issued by the defendant for the manufacture of the casket, were pre-

pared under the supervision and direction of Lt. Paden. Minor modifications in the cradle of the specified casket were suggested by various manufacturers during the later contract operations and approved by the Quartermaster Corps, but the casket produced was essentially that described in the specifications and drawings. The drawings were prepared from the casket model which had been made by the Galanot Products Company and submitted by the plaintiffs for the tests by the Bureau of Standards. The defendant's specifications were somewhat more detailed than the brochures submitted by the plaintiffs, but the ultimate casket produced was substantially the same as the seamless casket proposed by the plaintiffs in their brochures.

On November 19, 1945, the plaintiff Turkle, Mr. Bowden of Alliance-Ware and Mr. Bacon of Galanot Products Company called on Lt. Paden to offer assistance in the writing of the specifications. In December Lt. Paden informed Mr. Turkle that a Mr. Cotnam, of the Quartermaster Procurement Division, was involved in the matter of the purchase of the casket. This was the first time plaintiffs knew that someone outside the Memorial Division might award the contract. Mr. Cotnam was a section or subsection chief in the Procurement Division of the Office of the Quartermaster General whose duties were to determine sources of supply, prepare procurement directives and forward all necessary information to a procurement agency of the Quartermaster Corps. He was a sort of liaison officer between the Office of the Quartermaster General and contracting officers. He had no authority to make contracts at any time, and no authority to contract for the defendant for the use of any inventions, specifications, designs or procedure for the manufacture of caskets, or to pay compensation for such use.

The plaintiff Turkle called on Mr. Cotnam several times during the next few months, but neither of the plaintiffs said anything to him concerning their expectation of receiving royalties or other compensation for the use of the seamless casket idea in the repatriation program. Mr. Cotnam understood from Mr. Turkle that he was associated with the Galanot Company and was interested in obtaining a contract for the manufacture of the caskets. The plaintiffs on one occasion had a conference with General Feldman of the Quartermaster Corps, but they contacted no one in the Procurement Division other than General Feldman and Mr. Cotnam.

The procurement directive was prepared under the direction of Mr. Cotnam and forwarded to the Jeffersonville Quartermaster Depot. It stated the method of purchasing but contained no directive as to who should be awarded the contract.

The plaintiffs were never engaged in the business of manufacturing and selling caskets except as Mr. Nuss and Mr. Church had been employed by the Boyertown Casket Company and Mr. Turkle had purchased caskets for the use of his mortuary business. They had no manufacturing facilities, no engineering experience, and no financial resources with which to undertake the manufacture of caskets. They never built a seamless casket. When the five caskets submitted by various manufacturers were sent to the Bureau of Standards for testing, Major Beyers informed plaintiffs of the fact and they were afforded an opportunity to submit and did furnish a sample casket. They provided some of the materials and had a full-size model of their proposed casket manufactured in the Galanot Products plant, but the body section of this sample casket was composed of several parts welded together in a seamed construction.

The plaintiffs at all times represented themselves as being able to produce and supply caskets. From the beginning of their contracts with the Memorial Division the plaintiffs contemplated that they would collaborate with the Galanot Products Company and Alliance-Ware, Inc., having the Alliance people make the deep drawings and the Galanot Products Company fabricate and as-

semble the caskets. They believed they had the only source for deep drawings of that size in the country and that no one else could or would attempt to make it, and that they could negotiate a contract with the Memorial Division of the Quartermaster Corps as prime contractor for the manufacture of all repatriation caskets.

The plaintiffs were unsuccessful in an endeavor to raise funds by the sale of stock for such a venture. During the latter part of 1945 they entered into a memorandum of agreement with the Galanot Products Company by which it was agreed that upon the formation of a new partnership between the plaintiffs the Galanot Products Company would then enter into a contract with the plaintiffs by the terms of which the plaintiffs would be the exclusive sales representatives in negotiations to secure a possible order for the manufacture and sale of caskets to the armed services, and that plaintiffs would receive a sales commission of five percent of the proceeds of any such contracts obtained by the Galanot Products Company.

The Jeffersonville Quartermaster Depot issued invitations for bids on the manufacture of a repatriation casket and shipping case. Approximately 40 companies submitted bids. Five of them, including the Galanot Products Company, were awarded contracts totaling approximately $6,000,000 each, the contracts calling for each of such companies to produce 50,000 units.

Although seamless tops for caskets have been manufactured in the industry since 1929, and the design and manufacture of a cradle or support for the body had long been within the existing knowledge and skill of the metal-fabricating industry, one-piece, deep-drawn body sections for caskets were not manufactured prior to the repatriation program. The type of steel necessary for such deep drawing was not available prior to April 1926, and the necessary dies, presses and techniques were not developed prior to 1927. Deep-drawn seamless steel bath tubs were first manufactured in 1927 by Alliance-Ware, Inc., after an expenditure of a million dollars on research and development.

The concept of a casket with a seamless body, a seamless top and a cradle or support for the body was known and in the public domain prior to the time plaintiff Nuss conceived the idea. Patents had been issued in 1906, 1921, 1899, 1914, and 1937 for seamless caskets. The references to these patents are set out in finding 32.

The plaintiffs never obtained a patent for any of their ideas, although they contemplated obtaining patent protection and for the purpose consulted a patent attorney who advised them that their ideas were not patentable.

■ The defendant raises the question of the jurisdiction of this court. There is no question that this court has jurisdiction to render a judgment for the breach of a contract implied in fact.

There are several hurdles, however, which the plaintiff must surmount in order to establish such a contract.

In the first place, plaintiffs in the main dealt with officers who had no authority to enter into a procurement contract.

■ In the case of Federal Crop Insurance Co. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10, the Supreme Court used the following language:

"* * * Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority. * * * The oft-quoted observation in Rock Island, Arkansas & Louisiana Rail-

road Co. v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188, that 'Men must turn square corners when they deal with the Government,' does not reflect a callous outlook. It merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury."

From the record in this case we do not see anything which would enable the plaintiffs to escape the conditions laid down in this quotation. While at first blush they may seem to be somewhat extreme, yet, if, as a matter of practical operation, any contractor were permitted to establish a contract implied in fact upon a mere oral discussion by any employee of the Government in any division, regardless of whether he had authority to make such a contract, it would be very difficult to conduct the operations of the Government. There is a reason, therefore, for the requirement that the dealings must be with someone who has authority to make a contract for the Government before a binding obligation can be entered into.

The defendant also raises a serious question in that there was a public disclosure of the idea. In fact, plaintiffs admit as much in their brief, although they say that the disclosure was restricted. As a matter of fact the idea was presented and disclosed at public meetings several times after 1939.

Since the plaintiffs did not build any of the caskets they must depend upon an implied contract connected with the presentation of the idea and the preparation of the specifications.

It has been held that a disclosure of an unpatented invention or secret process not made in secrecy is a public disclosure. Moore v. Ford Motor Co., D.C., 28 F.2d 529; National Tube Co. v. Eastern Tube Co., 3 Ohio Cir.Ct.R., N. S., 459, 460–461; American Potato Dryers v. Peters, 4 Cir., 184 F.2d 165.

It is apparent from this record that in the early contacts the plaintiffs were presenting the suggestion to the Government believing as they did at that time that the Galanot Products Company and possibly Alliance-Ware, Inc., were the only people who were qualified to build a seamless casket and that these would be the only ones who would be interested in a contract with the Government. They evidently expected at the beginning to get their compensation from these companies. In fact, they had a contract with the Galanot Products Company to receive a five-percent commission on contracts that were made.

They were apparently surprised when they found that other companies would attempt to make them. They then changed their approach and decided they would undertake to present a claim against the Government on the theory that they furnished the idea and helped furnish the specifications.

We think the plaintiffs' claims, considered in the light of the entire record falls far short of furnishing a basis for holding the Government liable for breach of a contract implied in fact.

We have every respect for a man who undertakes to rope and hog-tie an idea and harness it for practical operation. An idea is an inanimate thing and will die of inertia or malnutrition no matter how much merit it may have unless some energetic person breathes into it the breath of life.

The idea was not a new one since several patents had already been issued.

The plaintiffs in this instance were acting primarily in the capacity of salesmen and promoters. This is not a criticism but merely a comment.

Salesmanship and advertising are essentials of American business life. They are valuable services. The old saying, often quoted and misquoted, to the effect that if a man can write a better book, preach a better sermon or make a better mousetrap than his neighbor, though he build his house in the woods, the world will make a beaten path to his door, may have been true when first expressed, but in the light of modern business practices he would probably starve before the public learned that he was in the woods.

■ We think that in presenting this idea to representatives of the Government and pressing for favorable action the plaintiffs rendered a service. The Galanot Products Company, in evident recognition of the value of such work, had contracted to pay them a commission on any contracts that might be secured. After the services had been rendered the plaintiffs sued that company and a compromise settlement was reached, the terms of which are not disclosed. It is apparent from the entire record that the whole purpose of the entire presentation was to interest the Government in contracting for the manufacture of the seamless casket, with the expectation on the part of plaintiffs that the company which secured the contract would compensate them for their services. When the entire record is considered the plaintiffs have no basis for recovery against the defendant. The petition is dismissed.

It is so ordered.

MADDEN, WHITAKER, and LITTLETON, JJ., concur.