**H. D. BARNETT, Individually and in behalf of the South Carolina Peach Council, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 74–1094.

United States District Court,
D. South Carolina,
Columbia Division.

Jan. 30, 1975.

Philip Wittenberg, Levi & Wittenberg, Sumter, S. C., for plaintiff.

John K. Grisso, U. S. Atty., for defendant.

## ORDER

HEMPHILL, District Judge.

Defendant moves for an order dismissing this action on the grounds that the court lacks (1) jurisdiction over the subject matter, (2) that complaint fails to state a claim upon which relief can be granted, (3) plaintiff has no contract with defendant and (4) the suit is barred by the doctrine of sovereign immunity. In the alternative defendant moves for summary judgment under Rule 56(b),[1] Federal Rules of Civil Procedure. Plaintiff, alleging his action as one *ex contractu* under the Tucker Act,[2] insists that on or about May 12, 1971, defendant, through agents in the Defense Department, contracted for sale and delivery of a shipment of peaches to and for the United States Army in Europe. The caption to the complaint indicates the plaintiff to be "H. D. Barnett, individually, and in behalf of the South Carolina Peach Council," but nowhere in the pleadings is the South Carolina Peach Council described, designated or claimed as a proper litigant. As far as this court is concerned, the only plaintiff is Barnett.

Plaintiff has chosen his vehicle, the Tucker Act, alleging his claim to be less than $10,000 to persuade jurisdiction in this court.[3] He maintains he had a contract with the United States and that the contract was broken. If no contract exists, no relief can be granted under the Tucker Act. If plaintiff cannot proceed under the Tucker Act, the action should be dismissed. Upon the pleadings, affidavits and exhibits submitted, this court makes the following

## FINDINGS OF FACT

1. H. D. Barnett is a citizen and resident of Sumter County, South Carolina, an affluent and successful producer of peaches. He was president of a group known as the South Carolina Peach Council during 1971 when the events, critical to this case, took place.

2. An effort was initiated by Mr. E. A. Anthony, S. C. Department of Agriculture, early in 1971 to expand markets for South Carolina peaches. Contact was made with several European fruit importers and the Defense Personnel Support Center at Philadelphia, Pennsylvania, which is involved in the procurement and supply of foodstuffs to the military establishment in Europe. Contact was also made with Mr. W. Dirksen (now representing H. A. Van Tuyl N.V., a large handler of Dutch vegetables and in the business of importing and exporting). Mr. Dirksen had been involved in importing iceburg lettuce which was being trimmed, wrapped, and repacked for the military. Mr. Anthony and Mr. Dirksen visited with Captain James Warren, U.S.N., to discuss the possibili-

---

1. Fed.R.Civ.P. 56(b) provides: Summary Judgment.

    (b) For Defending Party. A party against whom a claim, counter-claim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

2. 28 U.S.C.A. § 1346(a)(2) provides: United States as defendant.

    (a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

    (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express

or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

3. See *Konecny v. United States,* 388 F.2d 59 (8th Cir. 1967); *Akin Mobile Homes, Inc. v. Secretary of Housing and Urban Development,* 475 F.2d 1261 (5th Cir. 1973); *Putnam Mills Corp. v. United States,* 432 F.2d 553 (2nd Cir. 1970).

ty of moving peaches to the military establishment in Europe in a manner similar to that employed for lettuce in order to prove the ability of South Carolina to make physical delivery of the product and to meet whatever requirements that those who inspected for the military establishment demanded.[4]

4. Arrangement was made with the H. A. Van Tuyl Corporation to receive a test shipment of South Carolina peaches. The military was to inspect the peaches and advise of their acceptability. It was planned that those peaches that met military requirements could be repacked and sold to the military establishment and the remainder of them would be repacked for sale on the European market.[5]

5. Mr. Anthony reported the expectations and hopes of marketing South Carolina peaches to the military in Europe in a letter to S. C. Agriculture Commissioner William L. Harrelson, dated May 14, 1971, as follows:

On Wednesday, May 12, 1971 I met with the Defense Personnel Service Center in Washington in an effort to sell peaches to the military in Europe. The current procedure is for the Defense Department to accept delivery stateside. The problem is that the army has received many headaches in quality control, so they are buying very limited amounts of fresh fruit particularly perishable items.

I proposed to them that we send peaches to Rotterdam, Holland and be repacked for shipment to the military. The military would be invoiced for the peaches, freight and handling. Those peaches not acceptable to the military would be placed into commercial channels.

Mr. Dirksen of Rotterdam has agreed to handle the peaches as outlined above and would take all risks in selling the peaches.

This information has been furnished to H. D. Barnett, President of the Peach Council.

Mr. Barnett will coordinate the first load among the major shippers.

I have since received word that the Defense Department contacted the organization in Europe responsible for supplying food and that the Defense Personnel Service Command in Germany is very much in favor of this arrangement.

Mr. Dirksen has an appointment on Wednesday, May 19 with Colonel Swartz in Lautenslagen, Germany and will contact me after his visit.

This program is in addition to the Commercial Program already underway.

The first shipments were to be test shipments, and had the support of Senators Thurmond and Hollings, of South Carolina, and Governors McNair and West.

6. The affidavit of D. C. Hutchins, Agri-specialist—Marketing with the South Carolina Department of Agriculture (submitted by plaintiff in support of his position) states in part:

THAT, in late May of 1971 I was invited to participate in a meeting with Mr. Anthony, Mr. Dirksen (of the H. A. Van Tuyl Company in the Netherlands), Mr. H. D. Barnett (president of the South Carolina Peach Council), and Mr. Jerry Hardigree of Blue Goose Growers, Incorporated. During this meeting a plan was outlined whereby on a test basis fresh peaches could be shipped from South Carolina to the military in Europe via the Van Tuyl Company who had facilities to repack the fruit in event of deterioration in transit. It was explained that these arrangements were acceptable to the Pentagon. Mr. Barnett committed himself and the South Carolina Peach Council to participate in shipments of this nature.

---

4. This paragraph is taken verbatim from plaintiff's "Statement of Facts", handed to the court in support of the motion.

5. Ibid.

THAT, on June 1 Mr. Anthony resigned from the South Carolina Department of Agriculture and Mr. Robert B. Rogers pursued the project of test shipments of peaches to the military in Europe since considerable interest and enthusiasm had been generated regarding the project and commitment on supply had been confirmed.

THAT, Mr. Rogers arranged for co-operation from the Agriculture Research Service of the United States Department of Agriculture in the initial shipment. Personnel of the ARS would be on hand for the packing and loading of the fruit to ascertain proper loading and bracing. The container would be wired in order that temperatures could be taken throughout the load without opening the container while the peaches were in transit. Eighteen probes were actually in the fruit in different locations while six other probes would provide readings of various air movements. This was done so that in event of trouble with the load determination could be made of cause. I was to accompany the shipment and take charge of temperature settings and readings.

THAT, on or about June 22 I contacted Captain James A. Warren in the Pentagon to advise that the peaches would be harvested on June 24 for immediate shipment to the military in Europe. He advised that he was uncertain about final arrangements with Colonel Swartz on procurement of the peaches in Europe but since he was leaving his post as Director of Subsistence Management Policy For Supply, he would have Lt. Col. Stone, his deputy, call Col. Swartz and get back in contact with our office. He expressed enthusiasm toward the project and assured that he was interested in its success. Col. Stone did not communicate further with me or our office and plans proceeded under assumption that proper contact had been made with Col. Swartz.

THAT, on June 24 I was present when the peaches were harvested and packed. Greater care was taken to assure fully mature fruit was packed than is normal with regular domestic shipments. The fruit without doubt showed full potentials for proper ripening.

THAT, on June 25 I flew to Norfolk, Virginia, the point of embarkation for the shipment, and was immediately transported to the container by a Seatrain representative who had arrived a few hours earlier. I immediately checked temperatures and expressed concern that they were too high to successfully transport without deterioration. Seatrain representatives contacted Mobil Refrigeration Service to check the container in an effort to bring temperatures down. The object in mind was to transport the fruit without deterioration in order that proper ripening could take place at destination.

\* \* \* \* \* \*

THAT, only July 7 the peaches arrived in Zaltbommel, Holland where the load was inspected by representatives of the ARS of USDA and a Dutch inspector representing the Army. The Dutch inspector made no comment to indicate the peaches would not be accepted. Since information as to where and when the peaches would be forwarded was unclear, I was dispatched to meet with Col. Swartz in effort to determine the final destination of the peaches and when and under what conditions they would be transported in order that temperatures could be adjusted to properly ripen the fruit. I found Col. Swartz to be a most arrogant and insulting individual. He stopped just short of a reprimand for South Carolina engaging in a project to provide peaches to the military in Europe. He advised that he had authority to buy locally and indicated that this was a more favorable arrangement. He attacked the quality of the peaches we offered and further indicated his lack of interest in purchasing perishables stateside. He advised that he would not deal with Mr. Dirksen and made plain that any arrangement involving Mr. Dirksen was not acceptable to him.

THAT, I told Col. Swartz that we had placed him under no obligation to purchase from the Van Tuyl Company and that the peaches were being offered by the South Carolina Department of Agriculture and the South Carolina Peach Council. I further advised that the fruit was of excellent quality and that any information he had to the contrary had to be in error. He read me a telex from the Hague office that was unfavorable toward the fruit, calling it hard and immature. I told Col. Swartz that the fruit could be ripened for excellent eating quality by temperature control, but transit time and conditions of transporting were essential information for me to start the ripening process. Col. Swartz advised that his major was Micro-Biology and he knew what he was talking about. I again assured Col. Swartz that his information was in error and the fruit was different from that being described to him by his inspector. He said in a more controlled manner that he would expect me to defend the peaches since I was from South Carolina also. He further stated that he planned to buy some of the peaches. "It's not right," he said, "but I will take some of the peaches." I requested that Col. Swartz reinspect the load and assured him that I was confident the findings would be different. I further assured that we would repack the peaches to his satisfaction if another inspection found them to be unsatisfactory.

7. A report to Senator Thurmond from the Comptroller General of the United States (part of plaintiff's submission) reflects in part, as follows:

As you know, this shipment was a joint promotional venture of the South Carolina Department of Agriculture and the South Carolina Peach Council. The objective of this effort was to expand the market of the South Carolina peach industry by shipping peaches to a private importer in Europe who would sell to the U. S. Army those peaches that met its specifications. The peaches that did not meet the Army's specifications were to be sold through commercial channels by the import agent. Although a contract was not entered into, the promotional plan was well received by Department of Defense officials prior to the shipment of peaches.

\*     \*     \*     \*     \*     \*

It was the consensus of the USDA representatives that the basic reason for the Army's rejection probably was the hard condition of the peaches upon arrival. The hard to firm condition was stated by them to be normal for shipping perishable fruit and it did not harm the ripening process at the market end as long as the fruit is mature. We were told that the fruit in this shipment had to be picked hard in contrast to fruit shipped by European growers whose travel times and distances are much shorter.

8. A report to Senator Thurmond from the Assistant Secretary of Defense (submitted by plaintiff) reads in part as follows:

On 12 May 1971, at the request of Senator Holling's office, Captain Warren and Colonel Stone of my staff, met with Mr. Anthony who represented the South Carolina Peach Commission and Mr. Dirksen, a food importer/exporter in Holland. The purpose of the meeting was to inform my staff of a proposal by Mr. Dirksen for his firm to import South Carolina peaches for ultimate sale to Army commissary stores in Europe. Captain Warren explained at the outset of the meeting that the reason we were not buying U. S. grown peaches for use in Europe was because of the problem we had experienced in ripening the fruit at destination to the satisfaction of the consumer. Mr. Dirksen assured my staff that he recognized this as a problem in providing U. S. peaches, as well as some other highly perishable items to U. S. Forces overseas. He stated that this was one of the advantages of his importing the peaches and dealing direct-

ly with the Army in Europe rather than through the normal Defense procurement and distribution system. At the request of my staff, Mr. Dirksen subsequently confirmed his proposal in writing, a copy of which is enclosed for information. On the basis of the proposal and Mr. Anthony's desire, on behalf of the South Carolina Peach Commission, to coordinate a test shipment of peaces through Mr. Dirksen, my staff agreed to support the concept. It was, however, with the full understanding that our support did not constitute a commitment to procure the peaches; instead, it was the responsibility of Mr. Dirksen and Mr. Anthony to work out the details for such an arrangement with the U. S. Materiel Command in Europe, to their mutual satisfaction. Our initial effort in this matter was to have concluded when Colonel Stone telephoned Colonel Schwarz of the U. S. Army Materiel Command and informed him of the meeting and our desire to conduct a test shipment of South Carolina peaches to Europe under the conditions as outlined.

9. James A. Warren, in his affidavit of 2 October 1974, in support of defendant's motions, declared:

At no time did I make a commitment on behalf of the Department of Defense or the Department of the Army to purchase any peaches from plaintiff whatsoever. I was not an authorized contracting officer and was not empowered to make a contract on behalf of any agency of the Department of Defense. At no time did I do or say anything which would have indicated that I did have authority to enter into a contract binding on the United States. The responsibility for the operation of the subsistence program of each service was vested in the service itself.

The proposal submitted by Mr. Anthony and Mr. Dirksen to this office and subsequently relayed to Army authorities in Europe was that this was a test shipment of peaches by South Carolina

through a foreign importer/exporter who was to repack in ready-to-eat condition prior to sale to U. S. Army commissaries in Europe. The test was to determine if, by use of a middleman, peaches could be ripened to compete with the tree-ripened fruit subsequently available on the European market. At no time ever was a USDA grading of peaches considered as the determining factor of the test.

Should our objective have been only to ship South Carolina peaches to U. S. Army commissaries in Europe on the basis of a USDA certificate, we would simply have requested the Army procurement authorities in Europe to place a requirement for South Carolina peaches on the Defense Personnel Support Center (DPSC). DPSC is the designated procuring agency for subsistence items available in the U. S. DPSC would then have accomplished the procurement and shipment in a routine fashion—that is, acceptance by the Government would have been effected on the basis of a USDA certificate and the peaches shipped on a Government bill of lading to the Army in Europe. The cost of the peaches would have been charged to the commissaries, the cost of transportation charged to the Army transportation fund. That was the means by which peaches were formerly shipped to Europe. That procedure, however, was discontinued a number of years ago for the very reason that I initially stated—low acceptance of hard peaches.

10. Ralph L. Schwarz, in 1971 Director of Food for U. S. Army Materiel Command Europe averred (in his affidavit of 3 October 1974 filed by defendant in support of its motion(s)):

THAT, on Friday, 9 July, I received two more phone calls—one from MR. ROGERS and one from MR. DIRKSEN. During the conversations they quoted me a price from $8.17 to $8.80 for a ¾ bushel. I explained to them the price far exceeded the 16½ cents to 17 cents per kilo we were currently paying for mature, sweet peaches from Spain. MR.

ROGERS became very excited and told me he was willing to sell the peaches at any price. He told me, "I'll equal any price because if I can't sell these to the U. S. Forces I will have to pay the tariff in the Netherlands and the tariff will make the peaches uncompetitive in the market." I reiterated the practical and realistic situation of procurement and that I had made no commitments to buy. I had signed no contract nor had any requisition been submitted to subsistence Regional Headquarters in New York to order any peaches.

\* \* \* \* \* \*

THAT, MR. ROGERS called me again from South Carolina on Monday, 12 July. I informed him of our no-procurement decision. He was very upset and told me he had a man "holding the bag." He further indicated that MR. DIRKSEN had told him prior to the shipment that he had assurances the peaches could be sold to the U. S. Forces. He said MR. DIRKSEN told him that the information came in conversations with personnel at my directorate. This is not true. In every case, MR. DIRKSEN met with at least two or three of my representatives and me, and we continually reiterated that there had been no commitments and that he should be very careful not to advise anyone that we would purchase any peaches until they passed inspections upon arrival. I also told him that, since we did not requisition the peaches, any peaches arriving from the United States not under our auspices would be considered just as any other off-shore item.

THAT, sometime prior to the arrival of the peaches, I had another conversation with CPT WARREN in OSD; and I advised him of our long, past experience in trying to bring any U. S. peach into Europe. I told him we had previously encountered large losses and strongly recommended that he advise South Carolina of these problems prior to any test. CPT WARREN and I agreed that they could have a test without any commitments on the part of the U. S. Government; but if the peaches upon arrival were good and if we had a requirement, we were authorized to buy them.

THAT, subsequent to these actions, in August 1971 I received word the Government Accounting Office (GAO) had written a report indicating the Army was at fault. I met that month with GAO representatives in Washington, D. C.; and as a result of some further information, the GAO subsequently changed their report.

. \* \* \* \* \* \*

THAT, there was no agreement, verbal or written, on the part of myself or my personnel to order any peaches from South Carolina. There was no requisition sent to the Subsistence Regional Headquarters in New York for any peaches. We did not know that the peaches were coming until they arrived. The fact that the Netherlands wished to place a tariff upon the peaches indicated to me that they had not been in any way exempt from that tariff by being under military auspices. I further talked to Subsistence Headquarters, New York, and they concurred that no requisition for peaches had been received.

11. There is no written contract in the papers submitted to the court, and no evidence that defendant entered into a contract or commitment for the peaches.

Upon review of the foregoing findings this court publishes its

## CONCLUSIONS OF LAW

A. This court has jurisdiction of the parties and the subject matter *only* because of plaintiff's allegations. The facts before the court negate jurisdiction of this court under the Tucker Act.

■ B. This court has no jurisdiction under the Federal Tort Claims Act because a contractor cannot maintain an action under the Federal Tort Claims Act to recover damages arising out of a governmental agency's alleged breach of duties under an alleged contract; such must be instituted under the Tucker Act. *Woodbury v. United States*, 313 F.2d 291 (9th Cir. 1963).

C. This court finds that there is no express contract between the parties for purchase of peaches. Captain Warren was not authorized to bind the United States in any contract even if he had purported to do so. Captain Warren, in any event, clearly states that at no time did he intend to or did he actually enter into a contract with plaintiff on behalf of the United States. Therefore, if plaintiff is to recover, he must find the United States bound by a contract implied in act. It is settled law that no contract "implied by law" can be enforced on the United States. See *United States v. Algoma Lumber Company*, 305 U.S. 415, 59 S.Ct. 267, 83 L. Ed. 260 (1939); *United States v. Minnesota Mutual Investment Company*, 271 U.S. 212, 46 S.Ct. 501, 70 L.Ed. 911 (1926); *Merritt v. United States*, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643 (1925).[6]

D. Normal principles of estoppel and detrimental reliance are generally not applicable in suits against the United States. In order for there to be a contract "implied in fact" enforceable against the United States, there must be an actual agreement manifested by the actions of both parties. In addition, the United States must benefit from the transaction. *Corum v. United States*, 81 F.Supp. 728, 112 Ct.Cl. 479 (1949); *Bausch and Lomb v. United States*, 78 Ct.Cl. 584, cert. denied 292 U.S. 645, 54 S.Ct. 779, 78 L.Ed. 1496 (1934). In addition the officer allegedly making the contract must have had actual authority to bind the government in contract. *Federal Crop Insurance Corporation v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L. Ed. 10 (1947); *Sutton v. United States*, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099 (1941). Finally, the party seeking relief must not act as a volunteer, *Baltimore and Ohio Railroad v. United States*, 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816 (1923). It is clear that plaintiff fails on all three of these counts. The government received no benefit from plaintiff's activities. The individual whom plaintiff claims bound the government in contract had no authority to bind the government in any contract, and plaintiff's activity, as evidenced by his words and actions, shows that his actions were solely those of a volunteer. As stated in *Nuss v. United States*, 117 F.Supp. 413, 127 Ct.Cl. 197 (1954):

. . . if, as a matter of practical operation, any contractor were permitted to establish a contract implied in fact upon a mere oral discussion by any employee of the Government in any division, regardless of whether he had authority to make such a contract, it would be very difficult to conduct the operations of the Government. There is a reason, therefore, for the requirement that the dealings must be with someone who has authority to make a contract for the Government before a binding obligation can be entered into. (pg. 419)

See also *Cutler Hammer Inc. v. United States*, 441 F.2d 1179, 194 Ct.Cl. 788 (1971); *Sterner v. United States*, 434 F.2d 656, 193 Ct.Cl. 517 (1970).

E. In the absence of a contract with the United States, either express or implied, plaintiff cannot maintain this action. As a general rule, the United States is immune from suit unless it has specifically agreed to be sued. *United States v. Sherwood*, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). Waiver of sovereign immunity will not be presumed and will be strictly construed against the plaintiffs seeking to bring a suit against the United States. *United States v. King*, 395 U.S. 1, 89 S. Ct. 1501, 23 L.Ed.2d 52 (1969); *Soriano*

---

6. *Knight Newspapers, Inc. v. United States*, 395 F.2d 353 (6th Cir. 1968) is authority for the reasoning that the Tucker Act is a waiver of sovereign immunity, but such waiver is limited to express contracts and contracts implied in fact and does not extend to contracts implied in law or founded on equitable principles.

*v. United States,* 352 U.S. 270, 77 S. Ct. 269, 1 L.Ed.2d 306 (1957); *United States v. Shaw,* 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940). The waiver of sovereign immunity under which plaintiff attempts to sue (28 U.S.C. § 1346) is limited to actions based on contract. In the absence of a contract with the United States, the court is without jurisdiction to hear plaintiff's complaint. Therefore, plaintiff's suit is barred at the threshold because of lack of subject matter jurisdiction by the court.