## FIDELITY AND CASUALTY CO. OF NEW YORK, Plaintiff/Appellee,

v.

## PHILADELPHIA RESINS CORPORATION, Defendant/Appellant.

No. 83–1362.

United States Court of Appeals, Tenth Circuit.

July 2, 1985.

Rehearing Denied Sept. 12, 1985.

---

Seymour, Circuit Judge, filed dissenting opinion.

William H. ReMine, III of Montgomery Little Young Campbell & McGrew, P.C., Englewood, Colo., for plaintiff/appellee.

Karen J. McClurg, Kipp & Christian, P.C., Salt Lake City, Utah (D. Gary Christian and Teresa L. Sturm, Salt Lake City, Utah, on brief), for defendant/appellant.

Before BARRETT and SEYMOUR, Circuit Judges, and KANE,[*] District Judge.

BARRETT, Circuit Judge.

Philadelphia Resins Corporation (PRC), a Pennsylvania Corporation, and one of two defendants in the district court, appeals from judgment for the plaintiff, Fidelity and Casualty Company of New York. Plaintiff's insured was a French geophysical exploration company, Compagnie Generale de Geophysique (CGG).

This was a tort action which arose from an accident in a mountainous area north of Salina, Utah, on February 11, 1978. CGG had been conducting seismic operations in the area, and had contracted with Randall Rogers, a helicopter pilot from Pea Ridge, Arkansas, to fly CGG's seismic equipment and personnel to and from testing sites in the field. Prior to leaving for Utah to perform his transportation contract with CGG, Rogers contacted PRC by telephone and ordered three "Phillystran" synthetic fiber cables for use in suspending loads from the helicopter. Rogers had contacted PRC after reading an advertisement for the cables in "Aerial Applicator" magazine, a trade publication. R. Vol. IV, p. 125. Rogers told the PRC employee that he planned to use the cable in the Rocky

[*] The Honorable John L. Kane, Jr., United States District Judge for the District of Colorado sitting by designation.

Mountain region, although he did not know at the time what particular state he would be taking the cable to. R. Vol. IV, p. 134. PRC shipped the cables to Rogers' address in Arkansas, and Rogers brought them to Utah for use in performing his contract with CGG. On February 11, 1978, Rogers was lifting equipment belonging to CGG with his helicopter when the "Phillystran" cable snapped and the load fell to the ground, resulting in approximately $120,000 in damage to the equipment.

On January 15, 1980, CGG commenced this lawsuit, naming Rogers and PRC as defendants, alleging sale by PRC of a defective product and negligence on the part of both PRC and Rogers. PRC made a special appearance to contest the court's jurisdiction, but the court disagreed with PRC's position, deciding the question in favor of the plaintiff. After substitution of the insurance company as the named plaintiff, the cause was tried to a jury. The jury returned a special verdict, finding that Rogers was not negligent, that CGG was 12% negligent, and that PRC was 88% negligent. The jury further found that PRC had sold a defective product unreasonably dangerous to the user. Judgment was rendered accordingly, and PRC now appeals, raising three distinct issues for our review. However, we will consider only the first issue raised by PRC, that being whether or not the Utah district court had *in personam* jurisdiction over the Pennsylvania corporation. Because we find that *in personam* jurisdiction over PRC was lack-

ing, we will dismiss without consideration of the other issues of substantive law.

■ The question whether a federal court has *in personam* jurisdiction over a nonresident defendant in diversity cases is determined by the law of the forum state. *Yarbrough v. Elmer Bunker & Associates*, 669 F.2d 614 (10th Cir.1982). In applying this rule, the district court exercised *in personam* jurisdiction over PRC in accordance with Utah's "long arm" statute, which provides that a nonresident submits himself to the jurisdiction of the Utah courts on any claim arising from "The causing of injury within this state whether tortious or by breach of warranty." Utah Code Ann. § 78–27–24 (Supp.1983).[1] The statute, on its face, applies to PRC, and because the Utah legislature has specifically directed that the statute "should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution," Utah Code Ann. § 78–27–22 (Supp.1977), the "minimum contacts" doctrine of *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) becomes critical. Our inquiry is thus reduced to a single question: Does PRC have sufficient "minimum contacts" with the State of Utah to support the exercise of *in personam* jurisdiction?

■ Before examining the law of "minimum contacts" and applying that law to the facts of this case, we will review the evidence presented in the district court con-

---

1. Utah Code Ann. § 78–27–24 (Supp.1983) provides:

    **78–27–24. Jurisdiction over nonresidents—Acts submitting person to jurisdiction.** Any person ... whether or not a citizen or resident of this state, who in person or through an agent does any of the following enumerated acts, submits himself, and if an individual, his personal representative, to the jurisdiction of the courts of this state as to any claim arising from:

    (1) The transaction of any business within this state;

    (2) Contracting to supply services or goods in this state;

    (3) The causing of any injury within this state whether tortious or by breach of warranty;

    (4) The ownership, use, or possession of any real estate situated in this state at the time of contracting.;

    (5) Contracting to insure any person, property or risk located within this state at the time of contracting.;

    (6) With respect to actions of divorce and separate maintenance, the maintenance in this state of a matrimonial domicile at the time the claim arose or the commission in this state of the act giving rise to the claim.; or

    (7) The commission of sexual intercourse within this state which gives rise to a paternity suit ... to determine paternity for the purpose of establishing responsibility for child support.

cerning PRC's contacts with the State of Utah. We note in this regard that the burden of establishing *in personam* jurisdiction over the defendant is on the plaintiff. *Yarbrough v. Elmer Bunker & Associates, supra.* PRC is in the business of manufacturing and selling a variety of epoxy resin compounds,[2] as well as a variety of tower guys, ropes, and cables. PRC sells some 10–15% of its products in Pennsylvania, and has sold its products in all fifty states, although it has never sold "Phillystran" cables (the product used by Rogers) to customers in Utah. R.Vol. I, pp. 48, 51. From 1978 through 1980, PRC made sales of its other products to a total of ten customers in Utah, amounting to less than one-tenth of one percent of PRC's gross sales. R.Vol. I, pp. 63–64. PRC's epoxy resin products are sold through a network of distributors, but its "Phillystran" cables are sold directly to consumers with no distributorship network. R.Vol. I, p. 47. PRC advertises in trade publications targeted at specific professions or industries, which presumably have a national circulation, although, as PRC stated in answer to an interrogatory, "There is no way of determining where advertising ultimately ends up. Publications may well be disseminated worldwide." R.Vol. I, p. 52. There is no evidence that PRC advertises by any method specifically directed at the Utah market, nor is there any evidence that PRC employs any personnel in Utah. The sum total, then, of PRC's contacts in Utah are: (1) a miniscule number of sales of products other than "Phillystran" cable, (2) advertising in a national trade magazine that presumably reaches Utah, and (3) the failure of one of its defective "Phillystran" cables in Utah after the cable was taken there by one of its customers.

The leading case on the "minimum contacts" doctrine is *International Shoe Co. v. State of Washington, supra.* In that case, the State of Washington had asserted *in personam* jurisdiction over the International Shoe company for the purpose of assessing mandatory contributions to the State's unemployment compensation fund. The company was a Delaware corporation with its principal place of business in St. Louis, Missouri. It argued that the exercise of *in personam* jurisdiction was improper in that the company had no office in Washington, stocked no merchandise there, had no agent for service of process in the State, and made no contracts for the sale or purchase of merchandise there. The company did, however, employ some eleven to thirteen salesmen in the state, who exhibited samples of merchandise and solicited orders from prospective buyers. The result of these salesmen's efforts was a substantial volume of merchandise shipped into the State from St. Louis. The Court began its analysis by stating that the traditional, strictly territorial notion of *in personam* jurisdiction expressed in *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1877) had given way to a more flexible standard:

> [D]ue process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." (Citations omitted.) 326 U.S. at 316, 66 S.Ct. at 158.

The Court was not specific on just what kinds of "minimum contacts" would suffice:

> It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less.... Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to

---

**2.** These epoxy resin compounds include chocking and grouting compounds, adhesives and coatings, repair compounds, flooring and anti-skid compounds, and tank lining systems. R.Vol. I, pp. 46, 47.

the fair and orderly administration of laws which it was the purpose of the due process clause to insure. (Citations omitted.) *Id.* at 319, 66 S.Ct. at 159–160. There were hints in the Court's opinion that one factor in the decision would be whether the defendant's contacts were related to the plaintiff's claim or were unrelated to it. *Id.* at 318, 66 S.Ct. at 159. Since the company's sales activities in this case were obviously related to the State's assessment claim, *id.* at 320, 66 S.Ct. at 160, the Court had no occasion to explore the point.

In *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), the Court made it clear that *in personam* jurisdiction over a corporation could be supported by sufficient contacts in the forum state, even though such contacts were entirely unrelated to the plaintiff's claim. In this case, the defendant was a mining company with mines in the Phillipine Islands. When the Islands were occupied by the Japanese during World War II, the company's president moved his operations to an office in Ohio. All of the company's limited wartime activity was carried on from the Ohio office; secretaries were hired, correspondence was maintained, salary checks were drawn on local banks, etc. The activity was described by the Court as "continuous and systematic." When a disgruntled nonresident shareholder sued the company in Ohio, the Ohio courts refused to exercise *in personam* jurisdiction because the claim was unrelated to the company's contacts with Ohio. The Court noted the difference between the *Perkins* facts and the *International Shoe* facts, and stated: "The instant case takes us one step further to a proceeding *in personam* to enforce a cause of action not arising out of the corporation's activities in the state of the forum." 342 U.S. at 446, 72 S.Ct. at 418. The Court proceeded to enumerate the company's rather substantial contacts with the State of Ohio and concluded that the due process clause did not prohibit the courts of Ohio from taking jurisdiction of the case if it were appropriate to do so under state law.

In contrast with the *Perkins* fact situation, the facts in *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) involved a defendant with minimal contacts with the forum state, but the contacts that existed were directly related to the plaintiff's claim. In *McGee,* the plaintiff, a California resident, was the beneficiary of a life insurance policy, who sued in a California court to collect the proceeds of the policy after the insured (also a California resident) died. The defendant was a Texas-based insurance company that had assumed the obligations of the insurance contract from another insurance company. The defendant had mailed a reinsurance certificate to the insured in California, and the insured had mailed premiums from his home in California to the defendant's Texas office. The defendant maintained neither office nor agent in California, and had neither solicited nor done business there, apart from the transaction with this insured.

Nevertheless, the Court found the exercise of *in personam* jurisdiction to be valid. The Court made the following comment on the trend of "minimum contacts" law:

> Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more states and may involve parties separated by a full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a state where he engages in economic activity. 355 U.S. at 222–23, 78 S.Ct. at 201.

The Court then decided that jurisdiction was appropriate on the following rationale:

"It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State." *Id.*

The Court's language in *McGee* suggested a more lenient and expansive view of the "minimum contacts" doctrine; but a year later the Court's position stiffened somewhat in the case of *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In a complex fact situation involving the settlor of a trust who had changed her residence from Pennsylvania to Florida, competing beneficiaries of the trust, and a Delaware-based corporate trustee, the Court struck down the Florida Court's exercise of jurisdiction over the defendant Delaware trustee. Any contacts the trustee may have had with the State of Florida were, in the Court's view, due solely to the fact that the settler had moved there, and were not a result of any choice made by the defendant trustee. The Court elaborated on the "minimum contacts" test:

> The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. 357 U.S. at 253, 78 S.Ct. at 1240.

We now turn to the area of products liability and examine the "minimum contacts" doctrine in that context. Two cases in this area are particularly relevant to our inquiry. The first case is *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961). In *Gray*, the plaintiff, an Illinois resident, had purchased a water heater in Illinois that had been manufactured by the American Radiator & Standard Sanitary Corporation in Pennsylvania. The manufacturer had used a safety valve in the water heater that was made by the Titan Valve Manufacturing Company in Ohio. Titan's safety valve had failed, causing the water heater to explode and injuring the plaintiff. The plaintiff named Titan as a defendant; Titan, however, claimed that *in personam*

jurisdiction was lacking in Illinois because it did no business there. The Illinois Supreme Court disagreed, holding that *in personam* jurisdiction over Titan was supported by the fact that Titan had placed its safety valves into the stream of interstate commerce, with the expectation that at least some of the valves would be used in Illinois. Even though delivery into Illinois was accomplished by middlemen, the court found that Titan's business was indirectly affected and benefitted by transactions occurring in Illinois; therefore it would not be unreasonable to require Titan to defend in that state. *Gray, supra,* 176 N.E.2d at 766; *accord Ehlers v. U.S. Heating and Mfg. Corp.*, 267 Minn. 56, 124 N.W.2d 824 (1963); *Buckeye Boiler Co. v. The Superior Court of Los Angeles County,* 71 Cal.2d 893, 80 Cal.Rptr. 113, 458 P.2d 57 (1969).

The limits of the "stream of commerce" theory exemplified by *Gray* were delineated by the United States Supreme Court in *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In this case, the plaintiffs were a couple who had purchased a new Audi automobile from a dealer in New York. The plaintiffs were on their way to Arizona in the automobile when an accident occurred in Oklahoma. They brought a products liability action in an Oklahoma court, naming as defendants the manufacturer of the Audi, the importer, the distributor, and the dealer. The manufacturer and the importer conceded *in personam* jurisdiction, but the distributor and dealer contested jurisdiction. The distributor and dealer both conducted only local operations in the New York City metropolitan area, and had no contacts with Oklahoma other than their contractual arrangements with the nationwide Volkswagen/Audi network and the fact that an automobile that they had sold had somewhat fortuitously caused injury in Oklahoma. The Court found that *in personam* jurisdiction over the distributor and dealer was lacking, rejecting the argument that the defendants could have foreseen that their automobile might cause injury in Oklahoma:

It is argued, however, that because an automobile is mobile by its very design and purpose it was "foreseeable" that the Robinson's Audi would cause injury in Oklahoma. Yet "foreseeability" alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.

\* \* \* \* \* \*

If foreseeability were the criterion, a local California tire retailer could be forced to defend in Pennsylvania when a blowout occurs there ...; a Wisconsin seller of a defective automobile jack could be haled before a distant court for damage caused in New Jersey ...; or a Florida soft-drink concessionaire could be summoned to Alaska to account for injuries happening there.... Every seller of chattels would in effect appoint the chattel his agent for service of process. His amenability to suit would travel with the chattel.

\* \* \* \* \* \*

This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.... The Due Process Clause, by ensuring the "orderly administration of the laws," ... gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.

\* \* \* \* \* \*

Hence, if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unrea-sonable to subject it to suit in one of those States if its allegedly defective merchandise has then been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State. *Cf. Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961). 444 U.S. at 295–98, 100 S.Ct. at 566–67.

■ There is a subtle distinction between cases like *Gray* and the *World-Wide Volkswagen* case that is critical to the disposition of the instant case. If a defendant's product comes into the forum state as a result of a deliberate, although perhaps indirect, effort of the defendant to serve the forum state's market, then that defendant is subject to jurisdiction there. Placing one's product into the "stream of commerce" with the expectation of distribution into particular areas is the classic example of such an indirect effort. If, however, the defendant's product comes into the forum state as the result of the actions of an unconnected third party or of fortuitous events over which the defendant has no control, then the defendant is not subject to jurisdiction in the forum state. The distinction in these cases is really no more than a refinement of the "purposefully availing" test of *Hanson v. Denkla, supra.*

■ In applying the law of "minimum contacts" to the facts of this case, we hold that PRC's contacts with the state of Utah were insufficient to support the exercise of *in personam* jurisdiction by the district court. The instant cause of action arose, ultimately, from PRC's successful advertising efforts in Arkansas, together with the fortuitous transport of a PRC product into Utah; not from any effort PRC may have made to sell its products in Utah or to transport its products into Utah. Although PRC's employee may have known that the cable was destined for use in the Rocky

Mountain region, which includes Utah, it was never specifically foreseeable by PRC that its product was destined for the Utah market. PRC's relationship to the Utah market is simply too attenuated to support *in personam* jurisdiction under the "stream of commerce" theory expressed in the *Gray* case. Furthermore, we do not believe that PRC's advertising efforts change this conclusion. Although PRC's advertisement in a trade publication with presumably national circulation is relevant to the inquiry, it is less important than it would have been had the advertisement been seen and acted upon in Utah. If such had been the case, we believe that there would likely exist a close relationship between the advertising that had reached Utah and the cause of action.

While *in personam* jurisdiction can be based on contacts with the forum state that are either related to the cause of action or are unrelated to it, the "minimum contacts" doctrine requires contacts in the latter case to be more substantial. *See, e.g., Perkins v. Benguet Consolidated Mining Co., supra; Olsen By Sheldon v. Government of Mexico*, 729 F.2d 641, 648 (9th Cir.1984); Lilly, *Jurisdiction Over Domestic And Alien Defendants*, 69 Va.L.Rev. 85, 100 (1983); Brilmayer, *How Contacts Count: Due Process Limitations On State Court Jurisdiction*, 1980 Sup.Ct.Rev. 77, 82 (1980). In this case, the only contact that PRC has with Utah which is related to the cause of action is the fact that a PRC product happened to fail and cause damage in the State. The *World-Wide Volkswagen* Court made it clear that a seller of chattels does not, in effect, "appoint the chattel his agent for service of process." *World-Wide Volkswagen Corp. v. Woodson, supra*, 444 U.S. at 296, 100 S.Ct. at 566. PRC's knowledge of the mere possibility that its product might be taken into a region of the country in which Utah is located is not sufficient, in our view, to make a difference

in this regard. PRC also has contacts in Utah that are unrelated to the cause of action, namely advertising (which we assume reaches the state) and sales of other products there, but these unrelated contacts are likewise insufficient to support the exercise of *in personam* jurisdiction.[3]

We hold that PRC's contacts with the state of Utah, as shown by the record, are insufficient to support the exercise of *in personam* jurisdiction over PRC in accordance with the Due Process Clause. Thus, the judgment of the district court is vacated and the action is DISMISSED.

SEYMOUR, Circuit Judge, dissenting:

Because my review of the record convinces me that personal jurisdiction is present under *World-Wide Volkswagen*, I must respectfully dissent.

My disagreement with the majority centers on the application of *World-Wide Volkswagen* to the facts before us. In my view, a critical distinction exists between the defendants who successfully challenged in personam jurisdiction in *World-Wide* and defendant here. The defendants in *World-Wide* were a retail dealer and a regional distributor, whereas defendant in the instant case is the manufacturer. The manufacturer and national importer in *World-Wide*, Audi and Volkswagen, did not pursue the jurisdiction issue beyond an unsuccessful special appearance in district court. *See World-Wide*, 444 U.S. at 288 n. 3, 100 S.Ct. at 562 n. 3. Thus the discussion in *World-Wide* was directed at the propriety of asserting long-arm jurisdiction over a relatively local distributor and a local retail seller based on foreseeability alone. In this context, the Court stated:

"If foreseeability were the criterion, a local California tire *retailer* could be forced to defend in Pennsylvania when a blowout occurs there, a Wisconsin *seller* of a defective automobile jack could be

---

**3.** Inasmuch as federal courts acquire *in personam* jurisdiction in accordance with the law of the forum state and the Utah "long-arm" statute in this case authorizes jurisdiction on claims "arising from" certain activities of the defendant

(see footnote 1), it is doubtful whether the defendant's unrelated contacts with Utah are even relevant to the jurisdictional inquiry. This is a question of Utah law that we need not and do not decide.

haled before a distant court for damage caused in New Jersey or a Florida soft-drink *concessionaire* could be summoned to Alaska to account for injuries happening there. Every seller of chattels would in effect appoint the chattel his agent for service of process."

*Id.* at 296, 100 S.Ct. at 566 (emphasis added) (citations omitted). These examples all involve local defendant *sellers*, not *manufacturers* of a product sold nationwide. I believe this distinction is significant because the Court was careful in its discussion to differentiate between the defendants who sought to serve a national market, Audi and Volkswagen, and the defendants who served only a local market, World-Wide and Seaway.

In describing conduct by a defendant sufficient to permit long-arm jurisdiction, the Court stated:

"[I]f the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State. Cf. *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961)."

*Id.* at 297–98, 100 S.Ct. at 567. In view of the above passage, I do not believe that the Court in *World-Wide* narrowed the stream of commerce theory, at least with respect to national manufacturers and distributors. The critical inquiry under this theory is whether a defendant has attempted to serve a market and expects its product to be used there.

The record before us reveals that a sales representative from PRC admitted that PRC sells cable throughout the United States, and that it advertises nationally. Rogers testified that he saw PRC's cable ad in a national aviation magazine at an airport and thereafter contacted the company. The brochures PRC sent to Rogers depicted its cable being used on land, at sea, and in the air, and a reprint of a magazine article included by PRC with its brochures described the cable's use in "oceanographic moorings, instrument arrays and tow cables, helicopter wenching systems, ballon tethers, and aerial hoists." Rec., supp. vol. II, pl. dep. ex. 3. One persuasive indication that a manufacturer seeks to serve a market for its product in the forum state is its solicitation of business "through advertising reasonably calculated to reach the State." *World-Wide*, 444 U.S. at 295, 100 S.Ct. at 566. A manufacturer such as defendant here, who advertizes its product in a national magazine as suitable for use anywhere, does so in an attempt to serve the market for its product nationwide. Defendant is thus more analogous to the manufacturer in *World-Wide* than to the local distributor or retailer in that case.

Rogers also testified that use at high altitudes was relevant to the lift strength of the helicopter, and that he had told PRC's sales representative he would be using the cable for helicopter hoisting over the Rocky Mountain area. One of PRC's sales representatives testified that the representatives were required to determine exactly how the cable was to be used in order to help a customer select the appropriate type of cable.

In sum, the record shows that PRC aimed its advertising at a national market. PRC also knew when the cable in this case was sold that it was to be used in the Rocky Mountain area encompassing the state of Utah. Given these facts, I am convinced that the sale of the cable arose from the efforts of PRC to place its product in the stream of commerce with the expectation that it would be sold and used

in all states, including Utah. In my view, it is not unreasonable under the controlling cases to require PRC to defend in Utah, and long-arm jurisdiction is therefore appropriate. I would affirm the trial court's conclusion that it had personal jurisdiction over PRC.