**Knowlton H. BROWN, dba Knowlton H. Brown Construction Company, Plaintiff,**

v.

**WASHOE HOUSING AUTHORITY and United States of America, Defendants.**

**Civ. No. C85–647G.**

United States District Court, D. Utah, C.D.

Dec. 23, 1985.

Jack Fairclough, Salt Lake City, Utah, for plaintiff.

LeRoy S. Axland, Scott F. Young, Kathleen B. Barrett, Salt Lake City, Utah, for defendants.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

This matter came on regularly for hearing on October 30, 1985, on defendant Washoe Housing Authority's Motion to Quash or in the Alternative Change of Venue and on the United States of America's Motion to Dismiss. LeRoy S. Axland and Scott F. Young appeared on behalf of defendant Washoe Housing Authority, Kathleen B. Barrett appeared on behalf of defendant United States of America and Jack Fairclough appeared on behalf of plaintiff Knowlton H. Brown Construction Company. The issues were thoroughly briefed by the plaintiff and defendants and the parties presented extensive oral argument, after which the Court took the matter under advisement.

### FACTUAL BACKGROUND

This case arises out of a contract for the construction of low-cost housing on the Washoe Indian Tribe's land in the State of Nevada. The Washoe Tribe of the States of Nevada and California ("Washoe Tribe") is a federally chartered corporation created by the Indian Reorganization Act of 1934, Ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. § 461, et seq.). Defendant Washoe Housing Authority (hereinafter "Washoe") is a non-profit agency and a political subdivision of the Washoe Tribe created by the Tribal Council to provide low income housing on Washoe Tribal lands. Invitations to bid were developed by Washoe and placed for publication in trade journals in the Western United States during the months of April-July 1979. One such trade journal, *Intermountain Contractor,* is published in Salt Lake City and

is subscribed to by many major contractors in Utah for the purpose of learning about current construction projects and invitations to bid. The *Intermountain Contractor* published eleven weekly notices which furnished pertinent information on the projects, including solicitation of plans and specifications.[1] Defendant Washoe provided the bid information together with plans and specifications to the *Intermountain Contractor*, for the obvious purpose of seeking and encouraging bids or contract offers from intermountain construction companies, including those in Utah. Plaintiff Brown subscribed to the *Intermountain Contractor* in order to keep advised of potential construction projects and bid opportunities, and reviewed the publication at its Brigham City, Utah office. A Brown Construction Company employee read the notice of the Projects and requested of Washoe the pertinent bid forms, plans and specifications, which were sent to plaintiff's Utah office. Brown then submitted its bid on the Projects to Washoe. The July 20, 1979 issue of the *Intermountain Contractor* gave notice that Brown was the low bidder for the Projects and it was awarded the contract. Based upon that award, defendant Washoe mailed an approved HUD contract to plaintiff Brown's Utah office for signature, which Knowlton H. Brown signed in Utah and then returned by mail to Washoe. Thereafter, Washoe sent to Brown at its Utah office a copy of the contract signed by both parties and a Notice to Proceed on the contract. Brown contends, and Washoe does not dispute, that prior to and after the award there was communication on several occasions between Washoe and Brown by telephone and

through the mails. Brown received all payments in Utah and executed payment bonds required by HUD and Washoe in Utah with a Utah bonding company. Brown completed the contract with inspection and acceptance by Washoe and HUD in May 1980.

## PRESENT ACTION

On May 23, 1985, Brown filed a complaint against Washoe and HUD on claims arising out of the contract for the construction of the Projects on Washoe Tribal lands in Nevada. In the first cause of action it is alleged that during the course of construction plaintiff notified Washoe and HUD that breaches of the contract and improper contract administration by Washoe had caused the plaintiff to incur additional costs, work delay and other damages in the amount of $104,830.59, plus interest.[2] In the second cause of action plaintiff seeks to enjoin Washoe from doing anything with the funds it has received from HUD for the Projects which might preclude plaintiff from collecting a judgment. In the third cause of action plaintiff alleges tortious conduct on the part of HUD in exercising its control over the projects and in the handling of plaintiff's claims, as well as breaches of contract and warranty against HUD, for which plaintiff seeks judgment against the United States in the amount of $104,830.59, plus interest.

## I. *Personal Jurisdiction*

The first issue is whether Washoe's contacts with the State of Utah as outlined above are sufficient to subject it to personal jurisdiction in this forum. That issue

---

**1.** The invitations to bid were published on April 20, April 27, May 4, May 11, May 18, May 25, June 8, June 15, June 22, June 29, and July 6, 1979. The notices stated:

SINGLE HOUSING UNITS B/O 2: p.m. May 15
Gardnerville          Est. Cost: $2-1/2 million
Bid Opg. at Tribal Admin. Bldg. 4 miles south of Gardnerville.
Owner: Washoe Housing Authority, c/o Archt.
Archt: Lescher & Mahoney, 1755 East Plum Lane Airport Plaza #107, Reno NV 89502, (702) 322-5111
56 single housing units and a community bldg. to be built at three sites: Dresslerville site inclus. 11 3-bedroom units and 9 4-bedroom units and a community bldg. The Alpine

site incls. 10 3-bedroom units and 13 4-bedroom units. The Carson site incls. 5 3-bedroom units and 8 4-bedroom units.
(0515Q)
Plans and specs. fr. archt. $50 dep.
Plans and specs. in plan room #83.

**2.** Plaintiff asserts that it attempted for five years to obtain from Washoe or HUD payment or at least a final decision on the validity of its claims. Plaintiff asserts that both Washoe and HUD told it on several occasions that at least some of its claims were valid. No payments have been made and no final decision has been rendered.

involves an analysis of state statutory law and federal constitutional principles. In diversity actions, as here, the federal court must look to the law of the forum state to determine the issue of personal jurisdiction over the parties. *See Yarbrough v. Elmer Bunker & Assoc.,* 669 F.2d 614 (10th Cir. 1982); *Luckett v. Bethlehem Steel Corp.,* 618 F.2d 1373 (10th Cir.1980); *Segil v. Gloria Marshall Management Co.,* 568 F.Supp. 915 (D.Utah 1983). Once it is determined that the state law subjects a party to the personal jurisdiction of the forum, the court must determine whether the party's contacts with the state are sufficient to satisfy the due process requirements of the United States Constitution.

### A. Utah Long Arm Statute

The Utah Long Arm statute provides in pertinent part:

> Any person, notwithstanding section 16–10–102, whether or not a citizen or a resident of this state, who in person or through an agent does any of the following enumerated acts, submits himself, and if an individual, his personal representative, to the jurisdiction of the courts of this state as to any claim arising from:
>
> (1) the *transaction of any business* within this state;
>
> (Emphasis added)

*Utah Code Ann.* § 78–27–24(1), (3) (Supp. 1983).

1. *In General*—Early on, the Utah Court took a fairly restrictive view of the potential reach of the Long Arm Statute over out of state parties. *See, e.g., Union Ski Co. v. Union Plastics Corp.,* 548 P.2d 1257 (Utah 1976); *Hill v. Zale Corp.,* 25 Utah 2d 357, 482 P.2d 332 (1971). Those cases, and others relied upon extensively by Washoe in support of its Motion to Quash, exemplify the Utah Supreme Court's early hesitance to discard then traditional notions of personal jurisdiction.

*See* Strachan, *In Personam Jurisdiction in Utah,* 1977 Utah Law Review 235; *Mallory Engineering v. Ted R. Brown & Assoc.,* 618 P.2d 1004, 1006, *cert. denied sub nom., Valad Electric Heating Corp. v. Ted R. Brown & Assoc.,* 449 U.S. 1029, 101 S.Ct. 602, 66 L.Ed.2d 492 (1980). However, more recent pronouncements from that court have followed the national trend in jurisdictional jurisprudence of giving credence to express legislative intent. For example, in *Brown v. Carnes Corp.,* 611 P.2d 378 (Utah 1980), the Utah Supreme Court stated:

> In determining whether the claims of the plaintiff arise from the activities of the defendant and thus become cognizable in accordance with 78–27–24, reference to the Legislature's intent in enacting the Utah Long Arm Statute is illuminating. In declaring the purpose of the act the Legislature explained in 78–27–22:
>
> > It is declared, as a matter of legislative determination, that the public interest demands the State provide its citizens with an effective means of redress against nonresident persons who through certain significant minimal contacts with this State, incur obligations to citizens entitled to the State's protection....
> >
> > The provisions of this act, to ensure maximum protection to citizens of this state, should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of Fourteenth Amendment to the United States Constitution.
>
> The legislative mandate is clear. *The protection afforded by the courts of this state must be applied to the fullest extent allowed by due process of law.* (Emphasis added)

*Id.* at 380.[3] Under the aforesaid enunciated policy, a court would find no difficulty in

---

**3.** This statement does not necessarily mean that the statute and due process considerations are coterminous; the legislature does not intend to confer jurisdiction in all cases that the constitution permits. Rather, the legislature intends to

extend jurisdiction over specific categories of cases, and in those categories, to the fullest extent permitted by due process. Granted, many courts have taken a "one-step" approach to this type of jurisdictional question, simply

finding the requisite personal jurisdiction under several of the enumerated provisions of the Long Arm Statute. For example, an auto accident involving a non-citizen in this forum could easily fall under the tort category; a company that sends its products into the state but whose product fails or causes injury might be subject to jurisdiction under the breach of warranty category; a non-citizen father might be haled into this forum in a paternity action under the recently enacted sexual intercourse category; a party who contracts to supply goods into the state but breaches that contract might also satisfy the statutory requirements.

■ 2. *Transaction of Business*—"Transaction of business within this state" is defined in Section 78–27–23(2) of the Utah Code as "[the] activities of a nonresident person, his agents, or representatives in this state which affect persons or businesses within the State of Utah." The legislative mandate is very broad, and the Utah Supreme Court has given liberal construction to the definition and to the Utah Long Arm Statute in general. *See Synergetics v. Marathon Ranching Co.*, 701 P.2d 1106, 1110 (Utah 1985) for the Court's most recent discussion of the breadth to be given the Utah Long Arm Statute. Under a liberal construction of the Utah Long Arm Statute, this Court finds that Washoe's conduct falls within the statute's meaning and intent. Washoe supplied information to a trade journal that is located in Utah and that services Utah contractors. Washoe supplied plaintiff with bid information, sent plaintiff a HUD-approved contract for plaintiff's signature and sent plaintiff a copy of the executed contract. Other mail and wire correspondence occurred to and from Washoe, in and out of the State of Utah. Although modern modes of communication obviated the need for Washoe actually to enter this

State to transact business, the transaction of business no less occurred despite the absence of Washoe's physical presence. It is clearly the case that Washoe directed its business activities to residents of this state and that those activities affected persons or businesses within this state sufficient to satisfy the statute.

Since we find that defendant Washoe conducted activities in the State of Utah which affected persons or businesses within the State sufficient to satisfy the state statutory transaction of business requirement, we need not discuss whether the complaint sufficiently pleads the commission of a tort and injury, as an alternative ground for jurisdiction. We turn now to federal due process of law considerations.

B. *Due Process Limitations*

The next level of inquiry is whether Washoe has sufficient minimum contacts within the limits of the Fourteenth Amendment, to support the exercise of *in personam* jurisdiction. The case of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) expressed a flexible standard which superceded the traditional, strictly territorial concept of personal jurisdiction set forth in *Pennoyer v. Neff*, 95 U.S. (5 Otto) 714, 24 L.Ed. 565 (1877). This standard requires that a defendant, if not present within the forum, have "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice,'" before the defendant can be subjected to a judgment *in personam*. *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158. In examining the requirements for "fair play and substantial justice," the Supreme Court has taken into account "the burden on the defendant," "the forum state's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief,"

bypassing the statute and looking only at due process considerations. "This is probably not faithful to the legislative intent, and it undoubtedly is not what the Illinois Supreme Court had in mind when it first declared that the Statute [after which Utah's was fashioned] was intended

to reach the outer limits of due process" R.C. Casad, *Jurisdiction in Civil Actions* ¶ 4.01[1][b]m, at 405 (1983). Therefore, under the enumerated acts set forth in the Utah long arm statute, personal jurisdiction is extended to the limits of due process.

"the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several states in furthering fundamental substantive social policies." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980), *quoted in Burger King Corp. v. Rudzewicz,* —— U.S. ——, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). The Supreme Court has stressed "fair warning" and foreseeability as important factors in evaluating "minimum contacts" and determining "fair play and substantial justice" in any given circumstance. Thus in *Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683, the Court said that a party should have "fair warning that a particular activity may subject [it] to the jurisdiction of a foreign sovereign." The fair warning requirement is satisfied where a defendant "purposefully direct[s]" its activities "at residents of a forum, ... and the litigation results from alleged injuries that 'arise out of or relate to' those activities...." *Burger King Corp. v. Rudzewicz,* 105 S.Ct. at 2182 (1985) [citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) and *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984) ]. The Court has consistently held that the foreseeability of causing injury in a foreign state, in itself, is insufficient to satisfy due process requirements, stressing that "the foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. at 297, 100 S.Ct. at 567 (1980). The case of *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) sheds insight into when a party might reasonably anticipate such litigation:

> The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be *some act by which the defendant purposely avails itself of the privilege of conducting activities within the foreign state thus invoking the benefit and protections of its laws.* (Emphasis added)

*Id.* at 253, 78 S.Ct. at 1239–40, *cited in Burger King Corp.,* 105 S.Ct. at 2183.

■ It is clear that the due process clause does not mandate that a party physically enter the forum in order for there to be a valid exercise of personal jurisdiction. The Supreme Court addressed that question in *Burger King Corporation:*

> Although territorial presence frequently will enhance a potential defendant's affiliation with a state and reinforce that reasonable forseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a state in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" towards residents of another state, we have consistently rejected the notion that an absence of physical contact can defeat personal jurisdiction there. (105 S.Ct. at 2184.)

In the context of interstate contractual relations and obligations, on several occasions, the Court has "emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other state for the consequences of their activities." *Id.* [quoting *Travelers Health Ass'n. v. Virginia,* 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950) ]. The constitutional propriety of such an exercise of jurisdiction is based upon several grounds. First, a state has a "manifest interest" in giving its residents an "effective means of redress" for injuries inflicted by out-of-state parties. *McGee v. International Life Insurance Co.,* 355 U.S. 220,

223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957).[4] Second, a party should expect to litigate in the forum where business is performed because "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a state where he engages in economic activity." *Burger King Corp. v. Rudzewicz,* 105 S.Ct. at 2183 [quoting *McGee,* 355 U.S. at 223, 78 S.Ct. at 201]. It usually will not be unfair to subject a party to the burdens of litigating in another forum for disputes relating to his activities there. The third ground is purposefulness. Where a party "purposefully derive[s] benefit" from its interstate activities, "it may well be unfair to allow them to escape having to account in other states for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Id.* [quoting *Kulko v. California Superior Court,* 436 U.S. 84, 96, 98 S.Ct. 1690, 1699, 56 L.Ed.2d 132 (1978)].

Applying the aforesaid principles to the facts herein, it is apparent that Washoe had fair warning that it could be liable for suit in this forum because it purposely directed activities at residents of this forum which amounted to the transaction of business here. This litigation resulted from alleged injuries which arose out of and relate to those activities. By supplying bid information to the trade journal, which is published in Utah and services Utah and other intermountain contractors, and by entering into a construction contract with a Utah contractor, Washoe reached out beyond the State of Nevada and created a continuing relationship and obligations with citizens of this State. By accepting the bid of a Utah contractor and maintaining mail and telephone correspondence with that contractor, Washoe performed purposeful acts here and it was foreseeable to Washoe that it could be haled into court in this forum in an action arising out of its interstate relationship with the plaintiff.[5] In *Fidelity and Casualty Co. v. Philadelphia Resins Corp.,* 766 F.2d 440 (10th Cir. 1985) the defendant's product made its way into Utah and allegedly caused injury there. The defendant had advertised its product in a trade publication with presumably national circulation. However, the

---

**4.** *McGee v. International Life Insurance Co.* is a relatively early Supreme Court case on personal jurisdiction that involved a defendant with slight contacts with the state but whose contacts directly related to plaintiff's claims. The plaintiff, a California resident, was the beneficiary of a life insurance policy. After the insured died, plaintiff sued the Texas-based insurance company that had assumed the obligations of an insurance contract originally entered into by the deceased and another insurance company. The defendant had no agents nor offices in California and had done no business there other than its transactions with the insured. It simply had mailed a reinsurance certificate to the insured in California and had received premiums by mail from California. Finding the exercise of personal jurisdiction to be valid, the Court stated:

> Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more states and may involve partners separated by

a full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a state where he engages in economic activity.

355 U.S. at 222–23, 78 S.Ct. at 201.

**5.** In an almost identical fact situation, this court earlier reached the same result. In *Brown v. Provident Federal Savings & Loan Association,* No. C80–388A (Jan. 13, 1981), plaintiff Brown (also the plaintiff herein) brought an action on a contract it had entered pursuant to a bid submitted to an out-of-state party. The plaintiff became aware of the invitation to bid through its subscription to the *Intermountain Contractor,* the same trade journal involved here. Many of the same arguments were raised in that action but the Court concluded that the defendant's conduct was within the scope of the Utah Long-Arm statute, that the defendant had sufficient minimum contacts with the state and that subjecting it to the jurisdiction of this forum would not offend notions of fair play and substantial justice.

**602**

product's entry into the State of Utah had not been a result of the plaintiff's seeing and acting upon the advertisement. Rather, the product came into the forum as a result of the actions of an unconnected third party and other fortuitous events over which the defendant had no control. The Tenth Circuit concluded that because the advertisement had not been seen and acted upon by plaintiff in Utah, there was no relationship or connection between the defendant's conduct and the cause of action. The Court speculated, however, that had such been the case, there would have been a close enough relationship between the advertising that had reached Utah and the alleged injury to confer *in personam* jurisdiction over the defendant. *Id.* at 446–47. That circumstance exists herein. The trade journal to which Washoe supplied bid information was seen and acted upon in Utah, and it is that set of circumstances out of which this cause of action arises. Aside from Washoe's other contacts with the State by means of wire and mail, a relationship between the advertisement and the cause of action exists.

We hold that Washoe's actions constitute sufficient "minimum contacts" to satisfy due process and that it is fair and reasonable to require the defendant to appear and defend the action in this forum.

### II. *Venue*

■ Defendant Washoe moves in the alternative that this Court change venue to the Federal District Court of Nevada. A change of venue is discretionary with the Court. *Wm. A. Smith Contracting Co. v. Travelers Indemnity Co.*, 467 F.2d 662, 664 (10th Cir.1972). The moving party has the burden of establishing that the case should be transferred based upon the factors set forth in the venue statute:

> For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a). A change of venue pursuant to the statute is "to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience." *National Surety Corp. v. Robert M. Barton Corp.*, 484 F.Supp. 222, 223–24 (W.D.Okl. 1979). However, the policy of the courts is to give substantial deference to a plaintiff in selecting the forum. Therefore, the defendant's burden is heavy, and unless the circumstances of the case weigh heavily in favor of the transfer, plaintiff's choice should not be disturbed. *Id.* at 224.

■ The circumstances of this case do not weigh heavily in favor of a transfer. Based upon a review of the facts submitted, the Court is convinced that the burden to the defendant, in terms of time, energy and money, in litigating here is equal to or less than the burden the plaintiff would have if required to litigate in Nevada. Although the contract was performed mainly in Nevada, and most of defendant's witnesses and records may be in Nevada, those facts are insufficient to persuade the Court. Most if not all of plaintiffs' witnesses reside within this forum and all of plaintiffs' records are here. Plaintiffs' bonding company also is Utah based. The balancing of the relevant factors does not strongly favor the defendant, and the plaintiffs' choice of forum should not be disturbed. We therefore deny Washoe's Motion for Change of Venue.

### III. *HUD's Motion to Dismiss*

Defendant United States of America has moved for dismissal as to it for failure to state a claim and for lack of subject matter jurisdiction. The Complaint purports to state a claim against the United States in both tort and contract for HUD's involvement in the contract and in plaintiff's attempts to receive payment on its additional claims.

### *The Contract Claim*

■ In this action, the only express contract in existence was between the plaintiff and Washoe. Although HUD, through its supervision of the use of federal funds by the housing authority, approved the con-

tract, its involvement does not manifest an agreement between HUD and the plaintiff. A representative of HUD signed the contract indicating HUD's approval, but the contract named neither HUD nor the United States as a party therein. The approval itself did not create a contract, express or implied. *See Housing Corporation of America v. United States,* 468 F.2d 922, 924–25, 199 Ct.Cl. 705 (1972).

Plaintiff asserts that an implied contract or warranty arose by HUD's alleged assurances that the matter would be resolved in a timely manner and by HUD's involvement in approving the contract and the funding. This Court finds that as a matter of law the facts as alleged do not rise to the level of an express or implied-in-fact contract between plaintiff and HUD.[6] No actual agreement was manifested by words or action of both parties and there has not been a sufficient showing of consideration or that the government benefited from the alleged transaction. Those elements must be present before the United States is bound to an implied-in-fact contract. *See, e.g., Barnett v. United States,* 397 F.Supp. 631, 638 (D.S.C.1975). The Court therefore dismisses the breach of contract claim alleged against the United States.

### The Tort Claim

Plaintiff also alleges that the United States was "reckless, careless, negligent, willful and arbitrary" in failing to approve closing documents and failing to approve or disapprove plaintiff's claims for additional relief despite HUD's alleged promises that the matter would be timely resolved. The Court has serious doubts as to whether this claim is sufficiently pleaded to satisfy the requirements of the Federal Tort Claims Act. Assuming, however, that plaintiff does have a claim under the Federal Tort Claims Act an essential prerequisite to bringing such a claim in federal district court has not been followed, i.e., before

filing suit, a plaintiff must file an administrative claim with the appropriate agency pursuant to 28 U.S.C. § 2675. *See Three-M Enterprises, Inc. v. United States,* 548 F.2d 293, 294–95 (10th Cir.1977). Plaintiff has failed to comply with the jurisdictional requirements of the Federal Tort Claims Act and therefore this Court dismisses the tort claim for lack of subject matter jurisdiction.

For the reasons set forth above, the Court denies defendant Washoe Housing Authority's Motion to Quash and to Change Venue and grants defendant United States of America's Motion to Dismiss.

IT IS SO ORDERED.

---

**6.** No contract implied-in-law is enforceable against the United States. *See United States v. Algoma Lumber Co.,* 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260 (1939); *Barnett v. United States,* 397 F.Supp. 631, 632 (D.S.C.1975).